**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 24-48 |
| MARCOS FRANCISCO-TOMAS and | ) | |
| ANDRES FLORES-CEDENO | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

Presently before the Court are Motions to Suppress Evidence filed by Defendants Marcos Francisco-Tomas ("Mr. Francisco-Tomas") and Andres Flores-Cedeno ("Mr. Flores-Cedeno") (Docket Nos. 78, 81).  The Government filed Responses opposing Defendants' Motions (Docket Nos. 80, 86), and Mr. Flores-Cedeno filed a brief in support of his Motion (Docket No. 87).  The Court held a suppression hearing on April 10, 2025, the official transcript of which was filed on May 12, 2025.  (Docket Nos. 90, 92).  At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of law relative to Defendants' Motions.  (Docket Nos. 93, 94, 95).  The Government submitted its response to Defendants' proposed findings of fact and conclusions of law on July 11, 2025, at which time the Court took the matter under advisement. (Docket No. 97).  After careful consideration of the parties' submissions, the transcript of the proceedings, and the credible evidence of record, and for the following reasons, Defendants' Motions will be denied.

1

## II.  BACKGROUND

### A.  Procedural History

On February 27, 2024, Defendants were charged in a two-count Indictment with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 846, and possession with intent to distribute 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii), both for conduct occurring on or about February 17, 2024.  (Docket No. 16).  Defendants subsequently were arraigned and pled not guilty to the charges.  (Docket Nos. 38, 42).

Following Defendants' arraignments, they requested and were granted extensions of time to file pretrial motions.  Ultimately, Defendants both filed Motions to Suppress Evidence, which are opposed by the Government.  (Docket Nos. 78, 80, 81, 86, 87).  As stated, the Court held a hearing on Defendants' suppression Motions, all supplemental briefing is complete, and the matter is now ripe for disposition.

### B.  Facts

At issue here is whether evidence that was obtained following a protective sweep and subsequent search with a warrant of a residence, located at 1816 7th Street, New Kensington, Pennsylvania, 15068, (the "Subject Residence") should be suppressed, as Defendants advocate. At the suppression hearing, the Government called Special Agent Daniel Hoormann ("SA Hoormann") of the Drug Enforcement Administration ("DEA"), who testified concerning the events bearing on the matters at issue and who was subject to cross-examination concerning same. (*See* Docket Nos. 90, 92).  The Government also entered five exhibits into evidence:  the affidavit in support of the search warrant for the Subject Residence, and four video clips taken from a pole

camera view of the Subject Residence (hereinafter, "Ex. 2," "Ex. 3," "Ex. 4," and "Ex. 5"). (Docket No. 90-1).

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (internal quotation marks and citations omitted). Thus, the Court, "as finder of fact, is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).

In this Court's estimation, based on the demeanor and testimony of SA Hoormann in response to the questioning of the attorneys at the suppression hearing, SA Hoormann offered credible testimony concerning the events that unfolded on the date in question, despite the defense's efforts to impeach him.[1] *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) (noting that the factfinder's choice between two permissible views cannot be clearly erroneous "'[w]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'")). Additionally, SA Hoormann presented as an experienced law enforcement officer, given that he began his career as a police officer in Missouri working for seven years in patrol and in a county drug task force, after which he spent two years in the St. Louis DEA Office before joining the DEA in 2012. (Docket No. 92 at 13-14). SA Hoormann was assigned to the DEA's Chicago field office for five years, and he transferred to the Pittsburgh

---

[1]    The Court has separately reviewed the video clips from the pole camera, which were also shown during the suppression hearing in conjunction with SA Hoormann's testimony, and the Court notes that those video clips corroborate SA Hoormann's testimony. (Docket No. 90-1).

district office in 2017.  (*Id.* at 14).

Turning to the events of Saturday, February 17, 2024, on that day SA Hoormann was conducting surveillance of the Subject Residence from an undisclosed location.  (Docket No. 92 at 15-16).  He had been working with other agents, including his partner, DEA Special Agent Katelyn Bages ("SA Bages"), on a long-term investigation involving Defendants and other individuals.  (*Id.* at 14).  As part of that investigation, surveillance of the Subject Residence was being conducted by observing it through a mounted pole camera, which had been installed the previous December (approximately two and a half months prior to the events at issue).  (*Id.* at 15).  The camera footage was generally  reviewed through a computer each day by watching either a live feed or by reviewing what had been previously taped.  (*Id.* at 16).

On February 17, 2024, SA Hoormann was reviewing the camera footage of the Subject Residence from earlier that morning, when he switched to the live camera feed as he saw events beginning to occur.  (Docket No. 92 at 15-16).  Specifically, SA Hoormann observed Mr. Flores-Cedeno leave the Subject Residence through its detached garage at approximately 2:40 p.m.  (*Id.* at 16; Ex. 2 at 1:16).  Upon exiting, Mr. Flores-Cedeno appeared to be looking for something, and he ran toward the street where a tractor-trailer was parked next to the Subject Residence.  (Docket No. 92 at 16; Ex. 2 at 1:16 – 1:35).  As Mr. Flores-Cedeno approached the front passenger door of the tractor trailer, Mr. Francisco-Tomas exited that same door with a black duffle bag.  (Docket No. 92 at 17; Ex. 2 at 1:35 – 1:45).  Mr. Flores-Cedeno got in the front seat of the tractor trailer, and the tractor trailer pulled away.  (Docket No. 92 at 17; Ex. 2 at 1:30 – 1:57).  Meanwhile, Mr. Francisco-Tomas carried the black duffle bag, which appeared to be weighted, to the front door of the Subject Residence, set it down and appeared to use a key to open the door, and carried the bag inside.  (Docket No. 92 at 17; Ex. 2 at 1:43 – 2:25).  At that point, SA Hoormann notified the rest

of his team, and left his location to respond to the Subject Residence.  (Docket No. 92 at 20).

At approximately 4:00 p.m., another vehicle arrived at the Subject Residence and backed into its detached garage.  (Docket No. 92 at 20; Ex. 3 at :55 – 1:19).  After that vehicle was parked in the garage, Mr. Flores-Cedeno exited the garage and walked to the front door of the Subject Residence.  (Docket No. 92 at 20; Ex. 3 at 1:55 – 2:02).  At that point, SA Hoormann arrived at the Subject Residence, approached Mr. Flores-Cedeno, and detained him.  (Docket No. 92 at 20-21; Ex. 3 at 2:02 – 2:20).  Within seconds, SA Bages also arrived at the scene, exited her vehicle, and joined SA Hoormann in detaining Mr. Flores-Cedeno.  (Docket No. 92 at 20-21; Ex. 3 at 2:20 – 2:41).  SA Hoormann immediately checked the vehicle in the garage to make sure that no one else was inside, while SA Bages watched Mr. Flores-Cedeno.  (Docket No. 92 at 21; Ex. 3 at 2:35 – 2:49).  SA Hoormann also asked SA Bages to cover the Subject Residence's front door, to make sure "nobody comes out on us," while he handcuffed Mr. Flores-Cedeno.  (Docket No. 92 at 21).  According to SA Hoormann, at that point, the agents did not know if anyone else was in the Subject Residence, but they believed that it was very likely that at least one other person was inside.  (*Id.*).  The agents were specifically aware of another individual, Eric Vega, who they believed to be involved in the same drug-trafficking operation, but they did not know Mr. Vega's whereabouts at that time.  (*Id.* at 28).  Additionally, when the agents asked Mr. Flores-Cedeno if anyone was in the Subject Residence, he indicated that he did not know if anyone was inside.  (*Id.* at 23).

While SA Hoormann and SA Bages were by the Subject Residence's front door detaining Mr. Flores-Cedeno, and SA Bages was still covering that door, they heard a loud bang from the side of the house that sounded like a door being slammed open, and they also heard the sounds of someone running away.  (Docket No. 92 at 22-23).  At that point, SA Hoormann entered the garage to try to reach whoever had left the Subject Residence, but the internal garage door (which exited

to a yard) was locked. (*Id.* at 23; Ex. 4 at 1:24 – 1:33). SA Hoormann then spotted Mr. Francisco-Tomas, who was walking quickly in a nearby school parking lot. (Docket No. 92 at 24). SA Hoormann yelled at Mr. Francisco-Tomas to stop and get down on the ground, and Mr. Francisco-Tomas complied. (*Id.*). In his testimony, SA Hoormann also noted that, earlier in the course of this same investigation, he had experienced a similar situation involving Mr. Francisco-Tomas, in which Mr. Francisco-Tomas left a different residence in New Kensington through a back door soon after another individual had been detained and before a search warrant was issued. (*Id.* at 24-25).

Because his handcuffs had just been used to cuff Mr. Flores-Cedeno, SA Hoormann waited with Mr. Francisco-Tomas until a New Kensington police officer arrived and was able to take Mr. Francisco-Tomas into custody. (Docket No. 92 at 24). Once the New Kensington police officers arrived at the scene, Mr. Francisco-Tomas and Mr. Flores-Cedeno were placed in the back of marked New Kensington police cars. (*Id.* at 26). The agents planned that, once enough agents and officers were present at the scene, they would conduct a protective sweep of the Subject Residence. (*Id.* at 26-27). At approximately 4:11 p.m., DEA backup arrived, at which point a total of six agents and officers were present at the scene. (*Id.* at 27; Ex. 5 at 1:42 – 2:02).

At that time, a protective sweep of the Subject Residence was conducted to make sure that no one else was inside. (Docket No. 92 at 27-28). The agents had to pass through the Subject Residence's detached garage and yard in order to gain access to the Subject Residence through its side door, which Mr. Francisco-Tomas had left standing open when he fled. (*Id.* at 32). The door in the garage leading to the yard was locked from the yard side, however, so the agents broke a plexiglass window in the garage door to unlock it and reach the yard and the open side door of the Subject Residence. (*Id.* at 32). The agents then conducted a protective sweep of the Subject

6

Residence, which lasted approximately between four and five minutes, during which they made no observations of any illegal items or any evidence in plain view. (*Id.* at 27-30). After conducting the protective sweep, the agents walked between the Subject Residence and the school parking lot where Mr. Francisco-Tomas had been apprehended, in order to verify that nothing had been dumped when Mr. Francisco-Tomas was fleeing. (*Id.* at 30). Mr. Francisco-Tomas and Mr. Flores-Cedeno were then removed from the police cars and taken into the Subject Residence, where they were seated on stools in the dining room. (*Id.* at 30-31). At that time, SA Bages and SA Hoormann worked on the application for a search warrant for the Subject Residence, while the other law enforcement officers observed Defendants. (*Id.* at 31).

At approximately 7:15 p.m., the search warrant was signed by United States Magistrate Judge Maureen P. Kelly. (Docket No. 92 at 31). At that point, SA Hoormann took pictures of the exterior of the Subject Residence, and then took pictures of the interior as well. (*Id.*). The agents then ran a K9 officer through the Subject Residence and began their search. (*Id.*). Ultimately, a total of ten (10) kilograms of cocaine was recovered from the Subject Residence, as well as a number of other items. (*Id.*). SA Hoormann indicated that, although some of the narcotics were later found in rooms where the agents had previously done a protective sweep, those items had not been seen in plain view at that time. (*Id.* at 31-32). Additionally, of the narcotics seized, five (5) kilograms of cocaine was found in the attic of the Subject Residence, which was accessible through a closet, and which the agents did not check when they did the protective sweep. (*Id.* at 33-34)

## III.    DISCUSSION OF DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

In their suppression Motions, Defendants assert a number of reasons why the evidence seized following the searches of the Subject Residence should be suppressed. According to Mr. Francisco-Tomas's Motion, law enforcement officers initially went to the Subject Residence

7

without a warrant to search the premises. (Docket No. 78 at 1). Mr. Francisco-Tomas argues that agents encountered him, he did not give consent to search the Subject Residence, and he was arrested without probable cause – at which point the agents "broke in" to the Subject Residence, searched it, found narcotics, and subsequently obtained a search warrant. (*Id.*). Mr. Francisco-Tomas contends that the warrant was not supported by probable cause, arguing that no drugs were found on him and there was no connection between the crimes alleged and the Subject Residence. (*Id.*). He also maintains that the information contained in the warrant affidavit was stale, and that law enforcement lacked good faith in conducting the search of the premises. (*Id.* at 2). Mr. Francisco-Tomas specifically seeks suppression of the physical evidence seized during the search of the Subject Residence.[2]

In response to Mr. Francisco-Tomas's arguments, the Government contends that the affidavit of probable cause is replete with observations of Mr. Francisco-Tomas and others, his coconspirators, engaging in suspected money laundering and drug trafficking activities over an extended period of time. (Docket No. 80 at 2-7). The Government also disagrees that the information in the warrant affidavit was stale, noting that it included information from a few days prior to the application for the search warrant and information from the day of the application, as well as information about Mr. Francisco-Tomas and coconspirators engaging in a pattern of drug trafficking activities over an extended period of time. (*Id.* at 7). The Government also argues that, even if probable cause was lacking, the good faith exception applies to the search at issue. (*Id.* at

---

[2]    In his suppression Motion, Mr. Francisco-Tomas also seeks to suppress statements he made to law enforcement, allegedly admitting that he lived in the Subject Residence temporarily, because he was not given *Miranda* warnings. (Docket No. 78 at 2). The Government concedes that Mr. Francisco-Tomas was in custody at the time of these statements and was not *Mirandized*, so the Government agrees not to elicit testimony regarding such statements. (Docket Nos. 80 at 11; 94 at 1 n.1). Accordingly, Mr. Francisco-Tomas's motion to suppress statements will be denied as moot.

7-11).

Mr. Flores-Cedeno argues in his Motion that law enforcement officers illegally entered the Subject Residence under the guise of a protective sweep, and then conducted an illegal search that uncovered some, if not all, of the evidence the Government intends to use at trial. (Docket No. 81 at 2). Mr. Flores-Cedeno contends that, at the time of the first search, agents had not observed any illegal activity, nor did they possess a search warrant for the Subject Residence, and no exceptions to the warrant requirement apply. (Docket Nos. 81 at 2; 87 at 2). Mr. Flores-Cedeno also argues that, with regard to the second search of the Subject Residence authorized by the warrant, the warrant affidavit did not establish probable cause for the warrant's issuance because it failed to form a nexus between the alleged crimes and the place to be searched, and because it failed to contain facts temporally relevant to the formation of probable cause (*i.e.*, the facts were stale). (Docket Nos. 81 at 3; 87 at 4-6). Additionally, Mr. Flores-Cedeno asserts that the good faith exception does not apply here because the search warrant was so lacking in indicia of probable cause that it was unreasonable for law enforcement officers to rely upon it, and also because the agents had no more information when they applied for the warrant than they had prior to the protective sweep, at which time the agents knew they did not have probable cause for the warrant. (Docket Nos. 81 at 3; 87 at 6-7). Therefore, Mr. Flores-Cedeno seeks suppression of all evidence seized during the search of the Subject Residence, including narcotics, U.S. currency, a scale, a money counter, and miscellaneous receipts. (Docket Nos. 81 at 4; 87 at 1, 8).

In response to Mr. Flores-Cedeno's arguments, the Government responds that the protective sweep was lawful because the agents believed that an individual inside the Subject Residence might have posed a danger to their safety as they waited for the search warrant and that evidence might be destroyed or lost from within the Subject Residence. (Docket No. 86 at 2). The

Government contends that there is no evidence that the protective sweep resulted in agents conducting any search beyond confirming that no one was inside the Subject Residence, nor that any of the challenged evidence was observed in plain view or seized by agents during the protective sweep. (*Id.* at 6-8). The Government further argues that, with regard to the search warrant that was obtained after the protective sweep, the affidavit supporting the warrant does not rely upon evidence that was observed during the protective sweep, and probable cause was formed based on information and evidence obtained prior to the agents' entry into the Subject Residence. (*Id.* at 2-10). Thus, even if the protective sweep was conducted illegally, suppression is not warranted because the challenged evidence was seized under the search warrant. (*Id.* at 7-8). The Government further argues that the search warrant was supported by probable cause, the information that the warrant affidavit contained was not stale, and, even if probable cause was lacking when the search was conducted, the good faith exception applies here. (*Id.* at 9-13).

For the reasons that follow, the Court finds that suppression of the evidence seized from the Subject Residence is not warranted because no Fourth Amendment violation occurred.

## A. **Legal Standard – Fourth Amendment**

The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. *See* U.S. CONST. amend. IV. In order to suppress evidence, the defendant has the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). The burden of proof is preponderance of the evidence. *See United States v. Mastronardo*, 987 F. Supp. 2d 569, 575 (E.D.

Pa. 2013) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)).

Here, it is undisputed that the agents initially searched the Subject Residence without a warrant. Therefore, it is the Government's burden to show by a preponderance of the evidence that the initial protective sweep and the subsequent search of the Subject Residence were reasonable. For the reasons that follow, the Court finds that the Government has sustained its burden.

### B.  The Initial Protective Sweep

Defendants first argue that, in conducting the protective sweep of the Subject Residence, law enforcement engaged in an unlawful warrantless search, conducted when the agents knew that they did not have probable cause sufficient for the issuance of a warrant, that led to the seizure of narcotics and other evidence that Defendants posit should be suppressed. In response, the Government argues that the agents reasonably believed that an individual inside the Subject Residence may have posed a danger or could destroy evidence as the agents drafted and awaited the search warrant. Additionally, the Government argues that there is no evidence that the protective sweep resulted in the agents conducting any type of search beyond confirming that there was no one inside the Subject Residence. The Court agrees with the Government that the suppression Motions must be denied to the extent they are based on this argument by Defendants.

The United States Court of Appeals for the Third Circuit has held that a protective sweep of a home incident to an arrest made just outside of the home may be conducted based on a reasonable suspicion that "the areas being searched may 'harbor[] an individual' who poses a danger to those present at the scene of the arrest." *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). The Third Circuit further noted that this type of warrantless search is permissible because "'[i]t would be imprudent to prohibit

11

officers who are effecting an arrest or waiting until a warrant may be obtained from ensuring their safety and minimizing the risk of gunfire or other attack coming from inside the home if they have reason to believe that dangerous individuals are inside.'" *Id.* at 512 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 824 (3d Cir. 1997)). Additionally, exigent circumstances have been found to exist when officers believe that they must act "to prevent the imminent destruction of evidence." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Ker v. California*, 374 U.S. 23, 40 (1963)).

In this Court's opinion, SA Hoormann credibly explained at the hearing that the four-to-five-minute sweep of the Subject Residence was conducted for officer safety and to preserve potential evidence, as the agents planned to secure the Subject Residence, once sufficient backup arrived, so that they could apply for a search warrant. It was thus necessary for the agents' own protection and the preservation of potential evidence to sweep the Subject Residence so that the agents would not be attacked from the inside by a criminal associate of Defendants, to the extent one might have been present, and to prevent anyone else from fleeing the Subject Residence with potential evidence or destroying evidence. *See White*, 748 F.3d at 511. Notably, Mr. Francisco-Tomas had already fled the Subject Residence through one door while the agents were detaining Mr. Flores-Cedeno at another door. Additionally, as a result of their investigation, the agents suspected others of being involved in the drug trafficking conspiracy, and of potentially being present at the Subject Residence. Further, Mr. Flores-Cedeno had just indicated to the agents that he did not know if anyone else was inside the Subject Residence. The Court thus finds that the protective sweep of the Subject Residence was reasonable under the totality of the circumstances, particularly given that the agents were aware of other possible coconspirators, Mr. Flores-Cedeno himself did not know if anyone else was inside, and Mr. Francisco-Tomas had already fled the

premises.

In any event, no evidence was produced at the hearing showing that the protective sweep resulted in the agents conducting any type of search beyond confirming that no one was inside the Subject Residence. (Docket No. 92 at 28-30, 33-34). There is also no evidence indicating that any of the challenged evidence was observed in plain view or was seized by the officers during the protective sweep.[3] Most importantly, the affidavit in support of the application for a search warrant does not rely upon any evidence observed during the protective sweep, and probable cause was formed based on evidence obtained prior to the agents' entry into the Subject Residence (*see* discussion of the affidavit establishing probable cause, Section III.C, *infra*). (Docket No. 80-1). Therefore, even if the Court were to hold that the protective sweep was illegally conducted, which it expressly does not, suppression would not be an appropriate remedy because the record is uncontested that the challenged evidence was seized under the search warrant. *See Segura v. United States*, 468 U.S. 796, 799 (1984) (holding that following an illegal initial entry, evidence discovered during a subsequent search pursuant to a valid search warrant – issued wholly on information known to officers before the illegal entry – did not need to be suppressed as "fruit" of the illegal entry where the warrant and the information on which it was based were unrelated to the entry and thus constituted an independent source for the evidence).

### C. <u>The Affidavit Established Probable Cause for the Issuance of the Warrant</u>

Defendants both argue that suppression is warranted because the affidavit filed in support

---

[3] Both Defendants seemingly concede as much in their respective proposed findings of fact and conclusions of law. (*See* Docket Nos. 94 at 1; 95 at 2). Although Mr. Flores-Cedeno makes an unsupported assertion that agents conducted an unlawful search "[u]nder the guise of a protective sweep" and "uncovered" evidence, neither Defendant points to any evidence to suggest that the agents actually saw any of the challenged evidence in plain view during the sweep. (*Id.*). Moreover, both Defendants agree that the warrant affidavit does not make reference to anything involving the protective sweep. (*See* Docket Nos. 94 at 2; 95 at 3).

of the application for a search warrant for the Subject Residence lacked probable cause. The legal standard applicable to review of a magistrate judge's determination of probable cause is summarized as follows:

> "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 383 U.S. 410, 419 (1969)). A trial court exercises "only a deferential review of the *initial* probable cause determination made by the magistrate." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 236) (emphasis in original). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The deference given to a magistrate's issuance of a warrant "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (internal quotations omitted). Still, "'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (internal quotations omitted).

> A magistrate's role in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A warrant is to be upheld on review "as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at 1205. In conducting this assessment, a reviewing court is confined "to the facts that were before the magistrate judge, i.e., the affidavit, and [the court may] not consider information from other portions of the record." *Jones*, 994 F.2d at 1055. Stated otherwise, the District Court is restricted to viewing only the information confined by the "four corners" of the affidavit before the magistrate. *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000). "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner." *Miknevich*, 638 F.3d at 182. This includes "all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238. Further, "'probable cause is a fluid concept' that turns on 'the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules.'" *Miknevich*, 638 F.3d at 182 (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)). Proof beyond a reasonable doubt is not required. *Id.*

*United States v. Coca*, Crim. No. 14-262, 2016 WL 7013037, at *4 (W.D. Pa. Dec. 1, 2016).

Mindful of these legal principles, the Court turns to review of the affidavit in question, which is attached in redacted form as an exhibit to Mr. Flores-Cedeno's suppression Motion (Docket No. 81-2) and in unredacted form as an exhibit to the Government's response to Mr. Francisco-Tomas's suppression Motion (Docket No. 80-1) (hereinafter, the "Affidavit"). The Affidavit was prepared by SA Bages (who was on maternity leave at the time of the hearing in this matter), and SA Hoormann also participated in its drafting. (Docket No. 92 at 14-15). As is relevant here, at the time SA Bages prepared the Affidavit, she and SA Hoormann, who were partners and had worked together regularly for some time, were working together on the long-term investigation involving Defendants and other suspected coconspirators. (*Id.* at 15). SA Hoormann explained at the hearing that the 30-plus-page Affidavit was an "ongoing" affidavit that was drafted over time in the course of the investigation, and he indicated that he had reviewed and adopted the Affidavit's statements. (*Id.* at 14-15).

Turning to the Affidavit itself, SA Bages first detailed therein her own employment and experience as a DEA Special Agent, as well as her prior three years of experience as a police officer with the Missouri Science and Technology, Rolla, Missouri Police Department, which included one year as a Sergeant. (Docket No. 80-1, ¶ 2). SA Bages also described her four years with the Department of Defense Police, based out of the National Security Agency in Ft. Meade, Maryland, which included two years as a Sergeant and being tasked with handling the Drug Recognition Expert Program. (*Id.*). SA Bages explained that, as a DEA Special Agent, she investigates criminal violations of the Federal and State controlled substance laws. (*Id.*). SA Bages averred that she has been personally involved in narcotics investigations, and is therefore familiar with the various methods used by narcotics traffickers to transport, store, and distribute

15

narcotics and narcotics proceeds.  (*Id.*).  She also indicated that she has knowledge and experience with investigative techniques, including various types of visual and electronic surveillance, the use of search and arrest warrants, the laundering and concealing of proceeds from drug trafficking, and the street gangs who participate in these illegal activities.  (*Id.*).

SA Bages went on to describe the background of the investigation involving Defendants and other individuals in a suspected drug-trafficking operation, including the reasons why she had probable cause to believe that evidence of Defendants' criminal offenses was present at the Subject Residence.  As SA Bages averred in the Affidavit, a suspected drug trafficking and money laundering organization was operating throughout the United States, including in Allegheny County, Pennsylvania.  (Docket No. 80-1, ¶ 6).  The Affidavit included extensive details of the investigation into such organization, including the following:

- On January 16, 2023, Pittsburgh DEA agents were notified by Charlotte DEA agents of information from a reliable source that an unknown individual would be dropping off approximately $120,000 to a money launderer at an address in Tarentum, Pennsylvania. (Docket No. 80-1, ¶ 8).  The next day, agents observed Francisco VAZQUEZ, driving a Toyota Prius, meet with two men who appeared to leave the scene with a bag from the Prius.  (*Id.*  ¶¶ 9-12).  Subsequent surveillance showed that FRANCISCO-TOMAS, VAZQUEZ, and Eric VEGA were utilizing a residence at 1620 Riverside Drive, New Kensington, Pennsylvania. (*Id.* ¶ 13).  On January 30, 2023, a magistrate judge ordered that a GPS tracking device be installed on the Prius.  (*Id.* ¶ 14).

- On February 5, 2023, FRANCISCO-TOMAS and VAZQUEZ were documented driving the Prius to a Pilot truck stop in Portersville, Pennsylvania, and meeting with known drug trafficker Enrique SALINAS.  (Docket No. 80-1, ¶¶ 15-29).  Surveillance showed FRANCISCO-TOMAS and VAZQUEZ appeared to return to the Prius with a large backpack or duffle bag, which investigators believe likely contained controlled substances that FRANCISCO-TOMAS and VAZQUEZ subsequently brought back to 1620 Riverside Drive in the Prius.  (*Id.*).

- On March 3, 2023, investigators identified Michael JOHNSON at a residence at 724 Cedar Avenue, Pittsburgh, Pennsylvania.  (Docket No. 80-1, ¶ 33).  On February 23, 2023, surveillance showed FRANCISCO-TOMAS, VASQUEZ, and VEGA leaving that address and entering the Prius, and surveillance showed similar actions by FRANCISCO-THOMAS, VEGA, and JOHNSON on March 3, 2023.  (*Id.* ¶¶ 30-33).

- On April 12, 2023, surveillance showed FRANCISCO-TOMAS and VAZQUEZ leave 1620 Riverside Drive with a full black backpack in the Prius, meet with another individual, Jhon Darwyn CANIZALES-SOTO, and then arrive back at 1620 Riverside Drive with what appeared to be an empty black backpack. (*Id.* ¶¶ 34-36, 45). After that meeting, investigators recovered $125,000 from CANIZALES-SOTO. (*Id.* ¶¶ 37-44). Investigators believe that FRANCISCO-TOMAS and VAZQUEZ carried that money concealed in their backpack from 1620 Riverside Drive, and transferred it to CANIZALES-SOTO. (*Id.* ¶ 46).

- On May 12, 2023, surveillance of 1620 Riverside Drive showed VAZQUEZ exiting 1620 Riverside Drive carrying a teal backpack, and driving away in the Prius. (Docket No. 80-1, ¶ 47). When VAZQUEZ pulled the Prius over near Cedar Avenue, investigators approached him and recovered one kilogram of cocaine from the backpack. (*Id.* ¶¶ 48-50).

- That same day, investigators obtained and executed a search warrant for the Prius and for 1620 Riverside Drive, through which search they located a money counter, drug ledgers, financial documents, two cell phones, and security cameras connected to a DVR with a hard drive. (Docket No. 80-1, ¶ 51). Upon review of the DVR, investigators observed that 30 minutes after they had arrested VAZQUEZ with a kilogram of cocaine, FRANCISCO-TOMAS quickly exited the rear of 1620 Riverside Drive with a weighted backpack. (*Id.*). Investigators did not observe FRANCISCO-TOMAS in the Pittsburgh area for some time afterward. (*Id.* ¶ 52).

- On October 19, 2023, investigators observed JOHNSON meet with FRANCISCO-TOMAS and VEGA in the park across from 724 Cedar Avenue, and VEGA and JOHNSON use a cell phone that they passed back and forth to each other. (Docket No. 80-1, ¶ 53). Later investigation of JOHNSON's cell phone indicated that the phone call at that time was to Corey FLOWERS, who is located in Southern California and is responsible for organizing the distribution of controlled substances from Southern California to the Pittsburgh area. (*Id.*). FRANCISCO-TOMAS and VEGA departed the scene in a Toyota Corolla with a California license plate. (*Id.* ¶ 53).

- On October 24, 2023, a license plate reader ("LPR") picked up that California license plate on the Corolla, and investigators observed FRANCISCO-TOMAS, VEGA, and an individual believed to be Justin WESTON in the car. (Docket No. 80-1, ¶¶ 56-58). FRANCISCO-TOMAS and VEGA were observed carrying small white bags. (*Id.* ¶ 58).

- On November 21, 2023, LPR information led investigators conducting surveillance to observe VEGA drive the Corolla from an Aldi food store throughout New Kensington, until it backed into the detached garage of the Subject Residence, which FRANCISCO-TOMAS and VEGA were utilizing when staying in the Pittsburgh area. (Docket No. 80-1, ¶¶ 60, 61).

- On December 7, 2023, FLORES-CEDENO was seen leaving the Subject Residence in a Honda Civic and traveling west, and the vehicle was located the next day in Mahomet,

Illinois.  (Docket No. 80-1, ¶ 62).  On December 10, 2023, GPS tracker information indicated that the Corolla was in the area of the Pittsburgh Amtrak Station, and then traveled back to the Subject Residence.  (*Id.* ¶ 63).  Investigators learned from Amtrak Police that FLORES-CEDENO had purchased a cash ticket and was listed as a passenger who boarded a train in Chicago and exited a train in Pittsburgh during that time period. (*Id.* ¶ 64).

- On December 18, 2023, DEA Pittsburgh agents oversaw a controlled delivery of two kilograms of fentanyl.  (Docket No. 80-1, ¶¶ 65-73).  On that day, after DEA Pittsburgh agents received information that Andre NUNLEY was attempting to have packages of controlled substances delivered to an address in Pittsburgh, a suspicious package shipped from Pico Rivera, California, to such address was intercepted by UPSIS agents, agents removed the fentanyl and replaced it with inert substances, and NUNLEY was arrested after he received the package.  (*Id.* ¶¶ 65-69).  Upon a subsequent search of NUNLEY's cell phones, investigators identified a phone number later identified as being used by FLOWERS, the same phone number that was in contact with JOHNSON when he was meeting with VEGA and FRANCISCO-TOMAS in October, 2023.  (*Id.* ¶ 71).  Between December 10 and December 18, 2023, FLOWERS had also sent JOHNSON a number of WhatsApp messages and a picture of the USPS receipt with the tracking number for the two kilograms of fentanyl.  (*Id.*).

- On February 12, 2024, investigators observed a Lincoln sedan pull into the Subject Residence's detached garage, and an individual who appeared to be FRANCISCO-TOMAS obtained a suitcase from the trunk of the vehicle and went inside the Subject Residence.  (Docket No. 80-1, ¶ 74).  The next day, investigators observed numerous vehicles and individuals come and go from the Subject Residence, including WESTON. (*Id.* ¶ 75).  On February 14, 2024, the Pennsylvania Office of Attorney General executed search warrants at the residence of WESTON (which resulted in the seizure of a firearm) and at a second location utilized by WESTON to distribute controlled substances (which resulted in the seizure of approximately 700 pills of suspected fentanyl).  (*Id.* ¶ 76).

- On February 15, 2024, investigators interviewed a source of information who indicated that he/she had driven WESTON to the Subject Residence on several occasions, as recently as two weeks prior, to obtain quantities of cocaine.  (Docket No. 80-1, ¶ 77).

- On February 17, 2024, a tractor trailer stopped at the Subject Residence.  (Docket No. 80-1, ¶ 78).  FLORES-CEDENO exited the Subject Residence and entered the passenger door of the tractor trailer, and FRANCISCO-TOMAS exited the tractor trailer and carried a weighted duffle bag into the Subject Residence.  (*Id.*).  Soon thereafter, FLORES-CEDENO was observed walking away from the Subject Residence (investigators had not seen him return).  (*Id.* at ¶ 79).  A short while later, a vehicle backed into the Subject Residence's detached garage, and FLORES-CEDENO exited the vehicle and walked toward the front door of the Residence, at which point investigators approached and detained him.  (*Id.*).  While speaking to FLORES-CEDENO on the Residence's front porch, investigators heard the side door of the Subject Residence open and FRANCISCO-

TOMAS flee on foot. (*Id.*). After a short foot chase, FRANCISCO-TOMAS was detained in the parking lot of a nearby school. (*Id.*). Investigators subsequently conducted a protective sweep of the Subject Residence in order to secure it for a search warrant, and no other individuals were located inside. (*Id.*).

SA Bages set forth in the Affidavit her understanding, based on her training and experience, of the sophisticated techniques, either singly or in combination, that drug traffickers employ to further their business or to avoid detection by law enforcement, including that they commonly store items such as narcotics, business records, U.S. currency, firearms, and travel documents at their residences. (Docket No. 80-1, ¶ 80). Based on the foregoing, SA Bages averred that probable cause existed to believe that evidence, fruits, and instrumentalities of Defendants' criminal violations, such as records of drug transactions, proceeds of drug sales, currency, narcotics, and narcotics paraphernalia, was present in the Subject Residence. (*Id.* ¶ 81 and Att. B). After considering the Affidavit, the magistrate judge issued a search warrant for the Subject Residence. (Docket No. 92 at 31). Upon review, this Court finds that the information contained in the "four corners" of the Affidavit was sufficient for the magistrate judge to have determined that there was a substantial basis for a fair probability that evidence of controlled substance trafficking would be found in the Subject Residence.

Defendants, however, dispute that the Affidavit established probable cause for issuance of the search warrant. According to Defendants, the information in the affidavit was stale, and there was no nexus between the alleged criminal activity and the Subject Residence that was to be searched. With regard to the supposed staleness of information, Defendants argue that the Affidavit did not contain any observations of illegal activity on the day of the search or in the days leading up to the search. Defendants contend that, other than the non-criminal events in the days leading up to February 17, 2024, the relevant facts and/or allegations contained in the Affidavit

are from months earlier.

The Government, on the other hand, argues that the Affidavit outlines a detailed ongoing conspiracy between Defendants and other coconspirators in which, prior to the search warrant being issued, law enforcement seized approximately $245,000 in cash that was believed to be drug proceeds, one kilogram of cocaine, two kilograms of fentanyl, and 700 fentanyl pills.  The Government contends that such seized items were recovered from individuals who directly interacted with Mr. Francisco-Tomas as part of the alleged conspiracy, as outlined with specificity in the Affidavit.  The Government notes that, while some of the information contained in the Affidavit may not be recent, that information compiled over time demonstrates a continued pattern of drug trafficking activity.  Moreover, the Government points out that the Affidavit does provide recent information, from only four days prior, that Justin Weston was observed at the residence, and that, three days prior, search warrants were executed at Weston's residence and at another location he was using, in which fentanyl pills were recovered.  The Affidavit also includes recent information from a confidential informant who told law enforcement that he/she had driven Weston to the Residence in early February 2024 to obtain cocaine.

Here, the Court finds that the probable cause determination is not undermined by the contention that information provided in the Affidavit was stale.  It is true that probable cause can evaporate if the information in an affidavit is outdated.  *See United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002).  Accordingly, the "[a]ge of the information supporting a warrant application is a factor in determining probable cause."  *United States v. Harvey*, 2 F.3d 1338, 1322 (3d Cir. 1993).  If information is "too old, the information is stale, and probable cause may no longer exist."  *Id.*  Age alone, however, does not determine whether information is considered to be stale.  *See id.*  Thus, "[t]he likelihood that the evidence sought is still in place depends on a

number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983). Notably, the "passage of time loses significance when the evidence sought relates to protracted or ongoing criminality." *United States v. Henley*, 941 F.3d 646, 653 (3d Cir. 2019) (internal quotation marks and citation omitted). Moreover, "stale information can be refreshed with newer information that relates back to the subject of the older information." *United States v. Cintron*, 243 F. App'x 676, 679 (3d Cir. 2007) (citing *Tehfe*, 722 F.2d at 1120).

Viewed in the context of the facts of this case, the Court finds that the information cited in the Affidavit was not stale. First, there was information provided in the Affidavit from events that occurred on the very day of the application, and there was only a gap of a few days between the information regarding Weston and the date of the application. Additionally, while the extensive information regarding the alleged conspiracy stretches back over a longer period of time, such passage of time is significant to the ongoing nature of the criminal activity alleged here – an extensive drug trafficking operation. *See Henley*, 941 F.3d at 653; *Cintron*, 243 F. App'x at 679 ("[A]n activity such as drug trafficking is of a continuous and protracted nature and consequently the passage of time diminishes the significance of staleness in such cases."); *United States v. Williams*, 124 F.3d 411, 421 (3d Cir. 1997) ("The fact that evidence of the suspected criminal activity continued up through the last weeks before the search strongly suggests that the information in the affidavit was not stale."). Thus, under the circumstances presented here, the Court concludes that the information in the Affidavit was not stale when it was submitted in support of the application for a search warrant for the Subject Residence on February 17, 2024.

Similarly, the argument that there was an insufficient nexus between the Subject Residence and the alleged drug trafficking activities described in the Affidavit is unpersuasive. More

specifically, information in the Affidavit indicated that Defendants were either residing at or, at a minimum, utilizing the Subject Residence at the time of the search, and, as set forth, *supra*, the Affidavit described various instances of surveillance, seizures, and information provided by confidential sources in the course of the ongoing investigation that link the Subject Residence to the suspected drug trafficking activities. The Affidavit also contained averments regarding SA Bages' understanding, from her years of experience in law enforcement, as to how drug traffickers operate – including that drug traffickers often store items of evidentiary value in their residences. Thus, contrary to Defendants' arguments, the Court finds that it was reasonable for the magistrate judge to conclude that evidence of the alleged drug trafficking activities was stored in the Subject Residence, under the totality of the circumstances as just described. *See, e.g., United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) ("[D]irect evidence linking the residence to criminal activity is not required to establish probable cause . . . . Instead, probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested."); *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) ("The issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." (internal quotation marks and citations omitted)). Accordingly, the Court finds that the magistrate judge had a substantial basis for concluding that probable cause existed for issuance of the warrant to search the Subject Residence here.

### D. **Even if Probable Cause Was Lacking, the Good Faith Exception Would Apply to the Warrant.**

Even if the Court were to conclude that the warrant issued here was not supported by probable cause, the good faith exception to the exclusionary rule would apply in this case. The law regarding the good faith exception can be summarized as follows:

> The Supreme Court has held that evidence derived from a warrant not supported by probable cause is still admissible when obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge. *United States v. Leon*, 468 U.S. 897, 926 (1984). "[T]he purpose of the exclusionary rule - to deter police misconduct - would not be furthered by suppressing evidence obtained during a search 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (quoting *Leon*, 468 U.S. at 919-20).
>
> The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922. Indeed, "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 307-308 (3d Cir. 2001) (citing *Leon*, 468 U.S. at 922). The United States Court of Appeals for the Third Circuit has recognized that the good faith exception does not apply in four limited circumstances:
>
>> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>>
>> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>>
>> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>>
>> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.
>
> *Tracey*, 597 F.3d at 151 (citations omitted). These limited exceptions "involve conduct that is 'deliberate, reckless, or grossly negligent.'" *Id.* (quoting

*Herring v. United States*, 555 U.S. 135 (2009)).

*United States v. Gardenhire*, Crim. No. 15-87, 2017 WL 1105733, at *15 (W.D. Pa. Mar. 24, 2017).

Defendants appear to contend that the good faith exception does not apply because the third set of circumstances exists here, *i.e.*, that the search warrant for the Subject Residence was based on an Affidavit that was so lacking in indicia of probable cause that it was entirely unreasonable for law enforcement to rely on it in conducting the search. (Docket Nos. 78 at 2; 80 at 9; 87 at 7). This argument by Defendants is unavailing, however. As discussed, *supra*, the information contained in the Affidavit was sufficient for the magistrate judge to have found that there was a substantial basis for a fair probability that evidence of drug trafficking would be found in the Subject Residence.

To reiterate, the Affidavit did not simply set forth SA Bages' belief that probable cause existed without providing any supporting facts. Rather, the Affidavit described SA Bages' law enforcement experience and training in investigations and arrests. It also included extensive details regarding the ongoing investigation into a drug trafficking conspiracy that indicated Defendants' involvement, including surveillance of meetings and travel, seizures of items including money and narcotics, and information provided by confidential sources. The Affidavit also included more recent information, such as suspicious activity on the day of the execution of the warrant, including the arrival of a tractor trailer at the Subject Residence, Mr. Francisco-Tomas bringing a weighted bag into the Subject Residence, and Mr. Francisco-Tomas fleeing the residence as the agents spoke to Mr. Flores-Cedeno, all of which lead to the existence of probable cause to believe that evidence of the drug trafficking conspiracy was in the Subject Residence. Given this information, the Affidavit in support of the search warrant for the Subject Residence

contained the necessary indicia of probable cause, and a neutral and detached judicial officer issued the search warrant.  Under these circumstances, a reasonably well-trained law enforcement officer could have believed that the warrant and subsequent search were lawful.

In sum, even if the warrant was deemed insufficient because it was not supported by probable cause, the good faith exception would apply to the agents' search of the Subject Residence here.  *See United States v. Stearn*, 597 F.3d 540, 567-68 (3d Cir. 2010) (holding that, even if an affidavit suggesting that the defendant was a drug dealer and connecting his drug activities to a particular house did not provide probable cause to search the house, the good faith exception applied to police officers' search of a house pursuant to a warrant based on the affidavit; and that officers executing the warrant were not unreasonable in relying on the magistrate's probable cause determination).  The record in this case simply does not support a finding that one of the four limited circumstances that permit the avoidance of the good faith exception apply here. *See Tracey*, 597 F.3d at 151.  Consequently, suppression is not warranted in this case.

## IV.    <u>CONCLUSION</u>

For the reasons discussed herein, Defendants' Motions to Suppress Evidence (Docket Nos. 78, 81) are both DENIED.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date:  August 13, 2025

cc/ecf:  All counsel of record